ROBERT M. LEARY AND HELEN F. M. LEARY v. AERO MAY-FLOWER TRANSIT COMPANY, INC.

No. 7410DC497

(Filed 21 August 1974)

1. Evidence § 36— statement by defendant's employee — exclusion not prejudicial

In an action to recover for loss and damage to plaintiffs' household goods while they were being moved by defendant, the trial court did not err in excluding testimony by the femme plaintiff as to what an agent of defendant had told her with respect to several moves that had previously been made by the company.

2. Carriers § 10— loss of goods — necessity for pleading tariffs

In an action against a common carrier of household goods to recover for loss and damage to plaintiffs' household goods, the trial court did not err in allowing into evidence defendant's tariffs, though the tariffs were not pleaded as a defense, since there was nothing in plaintiffs' complaint which would notify defendant of any necessity to plead its tariffs.

3. Carriers § 9— bill of lading — conditions binding on shippers

Generally, a shipper who signs and receives a bill of lading without objection, after opportunity to inspect it, and permits the carrier to act on it by proceeding with the shipment is presumed to have assented to its terms; furthermore, even though conditions are not on the face of the bill of lading, if the bill of lading expressly states that conditions are to be found on the reverse side thereof, the bill of lading comes within the general rule, and the shipper is generally held to be bound by the conditions found on the reverse side.

4. Carriers §§ 9, 10— limitation of liability in bill of lading — applicability upon loss of goods

Where the contract between plaintiff shippers and defendant common carrier was entered into in Canada and there was no evidence as to where the loss of plaintiffs' goods occurred, the trial court properly refused to apply the Carmack Amendment of the Interstate Commerce Act prohibiting the limitations of liability attempted by defendant by its tariff and bill of lading.

APPEAL by plaintiffs from *Barnette, Judge,* 25 February 1974 Session, District Court, WAKE County. Heard in the Court of Appeals 31 May 1974.

In early 1970, plaintiffs were residents of Ottawa, Canada, but decided to move to some point in the United States, their ultimate destination being at that time unknown to them. The femme plaintiff, by use of a telephone directory, called a moving company entitled T. D'Arcy Limited, which held itself out as being an agent for Mayflower. The company sent a representative to the home of plaintiffs. He brought with him a Mayflower brochure and pictures of a Mayflower truck. The court found as a fact that T. D'Arcy was defendant's duly authorized agent in Ottawa. The femme plaintiff at that time stated, in response to question from her counsel, "As to whether I pointed out to him anything unusual about our particular property as distinguishable from household goods in general, yes; I told him two things—one, that it was a larger move than it looked like because of the way I store things; that people somehow think there is less there than there actually is, so I told him that it would probably take him a little bit longer to load it and a little bit longer to pack it than he might think, and the second was that there were a lot of very valuable antique clocks and furniture and pictures, and that sort of thing, that they would have to be crated and handled with great care, and he said that his company was (used to handling this sort of thing, and he described several moves that had come up from the United States, and one had moved into that area, you know, right down the street from us.)" (The portion of her answer in parenthesis was, over objection, ruled inadmissible but gotten into the record by counsel for purpose of appeal.) The information the representative left with plaintiffs stated that goods moved into storage for "usually no more than 180 days" were goods held in storage for later delivery and a service for which the mover would require an additional charge. The information further advised that "during this storage-in-transit period, the items and conditions of your agreement with the moving company apply, NOT the local warehouse regulations." However, the brochure specifically advised that "[a]t the end of the specified storage-in-transit period, and in the absence of final delivery instructions from you, the shipment will go into 'permanent storage' status and will thereafter be subject to rates, terms, and conditions set by the local warehouse. Any further service will then be under a separate contract with the warehouse. Permanent storage

warehousing operations are not generally subject to ICC regulations." On 12 June 1970, plaintiffs entered into a contract with defendant under which defendant agreed to move the household effects of plaintiffs from their home in Ottawa to T. D'Arcy Limited's warehouse to be held there as a storage-in-transit pending final instructions from plaintiffs as to the ultimate destination and time of delivery of the property.

Plaintiffs and defendant prepared an inventory of the items to be placed in storage-in-transit and ultimately shipped by defendant, and the male plaintiff signed a bill of lading which, among other things, provided on the left side of the first page: "The shipment will move subject to the rules and conditions of the carrier's tariff (sic) shipper hereby releases the entire shipment to a value not exceeding $25,000." The blank provided for the figures carried under it the notation "to be completed by person signing below". Immediately thereunder was the following: "Notice: The shipper signing this contract must insert in the space above, in his own handwriting, either his declaration of the actual value of the shipment, or the words '60 cents per pound per article' otherwise the shipment will be deemed released to a maximum value equal to $1.25 times the weight of the shipment in pounds." Under this appears the signature of male plaintiff and the date June 12, 1970. Under that appeared these words: " 'Important notice to shippers of household goods.' 'General information for shippers of household goods' pamphlets have been given to shipper or his agent." This bears an illegible signature characterized as "Carrier or authorized agent of carrier". On the right side of the front page the value of $25,000 was also inserted, and at the bottom of the column entitled "Weight and services" there was a blank blocked space entitled "Declaration of Documents, Specie, Extraordinary Valued Articles". This space was left blank.

On the second page of the bill of lading, the following appears: "SECTION 1. The carrier shall be liable for physical loss of or damage to any articles from external cause while being carried or held in storage in transit EXCEPT for condition or flavor of perishable articles, and EXCEPT documents, currency, money, jewelry, watches, precious stones or articles of extraordinary value which are not specifically listed on the bill of lading . . . "

On 28 February 1972, plaintiffs instructed defendant to pick up their household effects and deliver them to an address

in Raleigh. Defendant did, on 13 March 1972, pursuant to these instructions, pick up the goods stored by plaintiffs and load it onto defendant's truck for delivery to Raleigh on 16 March 1972. The driver, as was his duty, checked off the items on the inventory sheet which had been made when the items were stored and prepared a three page exception sheet for those items which were damaged while in storage or those items not delivered to him by D'Arcy. These items are not in dispute here. When the goods arrived in Raleigh, more items were missing and more items were damaged. Among the items missing were the following: an antique ceramic jug, valued at $85; carton containing antique woodworking tools, valued at $300; antique trunk, valued at $80; wooden crate containing professional files and other documents, valued at $2,000; and a 12 by 15 foot oriental rug, valued at $1,000. The total value placed on these items was $3,465. The court heard the matter without a jury and entered judgment for plaintiffs in the amount of $2,302 but found as a fact that the items having a total value of $3,465 constituted documents and articles of extraordinary value which plaintiffs were specifically required to list on the bill of lading. It further found that they did not so list them nor at any time during the contract negotiations with defendant or any of its agents did they specifically state that any of the items to be shipped were documents or articles of extraordinary value. Plaintiffs excepted to these findings of fact and to the conclusion of law based thereon that plaintiffs were not entitled to recover the $3,465 and appealed.

*John V. Hunter, III, for plaintiff appellants.*

*Teague, Johnson, Patterson, Dilthey and Clay, by Robert W. Sumner, for defendant appellee.*

MORRIS, Judge.

[1] Plaintiffs first argue that certain evidence was erroneously excluded. The record does not show what the question was, so we cannot know whether the objection was to the form of a question, the content of a question, or the form or content of an answer or attempted answer. It is of no consequence, however, for the contention is without merit. Plaintiffs' counsel apparently had inquired of the femme plaintiff whether she had pointed out to the defendant's representative anything unusual about their property as distinguishable from household goods generally. The witness responded that she had told him two

things—one, that it was a larger move than it appeared because of the way she stored things; and the second was that "there were a lot of very valuable antique clocks and furniture and pictures, and that sort of thing, that they would have to be crated and handled with great care, and he said that his company was"—At this point defendant objected, the objection was sustained, and the court allowed the witness to answer for the record. Her answer was "He said that his company was used to handling this sort of thing, and he described several moves that had come up from the United States, and one had moved into that area, you know, right down the street from us." Plaintiffs contend that the answer is admissible under the general rules applying to admissions by agents and employees. We fail to see any prejudicial error in its exclusion. The answer to the assumed original question never mentions any one of the articles involved on appeal. The excluded portion certainly does not. The court obviously found an agency relationship between T. D'Arcy Limited and defendant, and that queston is not before us on appeal. The excluded portion of the answer contains no admission of an agent which would be beneficial to plaintiffs. Certainly, its exclusion does not constitute reversible error.

[2]  Plaintiffs next contend that the admission into evidence of defendant's tariffs, over objection, was error because the tariffs were not pleaded as a defense and also because there was no evidence that they were lawfully in effect. In their brief, plaintiffs apparently take the position that the existence of the tariff is an affirmative defense and must be pled. They offer no authority for this position, except to state that the analysis found in 2A Moore's Federal Practice, § 8.27 (3), indicates that under Rule 8 (c) a defendant should plead affirmatively any avoidance or affirmance which goes beyond a mere negation of the plaintiff's prima facie case. We do not disagree with this position. In this case, however, the plaintiffs, in their complaint, said nothing to indicate to defendant that claim for full value would be made for these specific items. The complaint merely alleged that "defendant, in consideration of a reasonable compensation to be paid by the plaintiffs, agreed to safely carry certain household furniture, appliances, and other personal property belonging to the plaintiffs from Ottawa, Ontario, Canada, to Raleigh, Wake County, North Carolina." The complaint further alleged that plaintiffs' property was received by Mayflower on or about 13 March 1972, in Ottawa, for which delivery defendant executed and gave to plaintiffs its bill of lading, thereby acknowledging

receipt of the goods in good order; that the property was in sound condition when delivered to Mayflower and, in exercise of ordinary care, could have been delivered to its destination without loss or delay; that defendant was negligent in particular respects and had exclusive possession, control and management of the property from the time of its receipt by it in Ottawa until it was delivered in a damaged condition in Raleigh at a time later than it contracted to deliver the goods. Defendant's answer was an admission that it agreed to carry the goods as alleged and a denial of all other allegations. We see nothing in the complaint which would notify defendant of any necessity to plead its tariff. Indeed, it was not until trial that defendant had any notice that plaintiffs claimed that articles of extraordinary value were included in the shipment. Plaintiffs do not argue their contention that there was no evidence that the tariffs were lawfully in effect. This candor is commendable in view of the fact that plaintiffs introduced into evidence the bill of lading which referred to the tariff and specifically provided that "the shipment will move subject to the rules and conditions of the carrier's tariff". The bill of lading also contained, at the top thereof, the following: "Received subject to classifications, tariffs, rules and regulations including all terms printed or stamped hereon or on the reverse side hereof in effect on the date of issue of this bill of lading." Immediately under Mr. Leary's signature as to value appeared this " 'IMPORTANT NOTICE TO SHIPPERS OF HOUSEHOLD GOODS.' 'General Information for Shippers of Household Goods' pamphlets have been given to shipper or his agent." This was signed by an agent of the carrier. This pamphlet, introduced in evidence by both plaintiffs and defendant, was identified by both Mr. and Mrs. Leary, both of whom testified that they read it prior to the move and were familiar with its contents. The tariff was identified, without objection, as the tariff which was in effect for the year of 1970. The bill of lading, which Mr. Leary signed and with which he said he was familiar, and the pamphlet issued by the Interstate Commerce Commission entitled "Summary of Information for Shippers of Household Goods", which both plaintiffs admitted having read, were sufficient to put them on notice that their shipment was subject to defendant's tariff on file with the Interstate Commerce Commission.

With respect to the bill of lading and tariff, "Ordinarily, the contract is embodied in the shipping receipt or bill of lading, but this does not constitute the entire contract; rather, such

receipt or bill and the operative tariffs and schedules constitute the entire contract of carriage." 13 Am. Jur. 2d, Carriers, § 226, p. 741, and cases there cited.

[3]   While it is true that an oral agreement to do a certain thing is not necessarily merged by a later bill of lading, *McAbsher v. R. R.*, 108 N.C. 344, 12 S.E. 892 (1891), here there was no evidence of any oral agreement with respect to any specific items included in the shipment either with respect to value or handling. The only scintilla of evidence in this respect is the reference by both Mr. and Mrs. Leary to antique clocks. These are not the subject of this appeal, nor was there any oral agreement even with respect to those. Mr. Leary did testify that when he signed the bill of lading, there were certain places left blank. These were the address and other information with respect to the place and time of delivery in Raleigh. The values and all other pertinent information was in the bill of lading. In *Schroader v. Express Agency*, 237 N.C. 456, 459, 75 S.E. 2d 393 (1953), the Supreme Court, through Parker, J., (later C.J.) said:

> "A bill of lading is said to be both a contract and a receipt. It is a receipt for the goods shipped, and a contract to transport and deliver the same *as therein stipulated.*" (Emphasis supplied.)

Generally, the majority view is that a shipper who signs and receives a bill of lading without objection, after opportunity to inspect it, and permits the carrier to act on it by proceeding with the shipment, is presumed to have assented to its terms. 13 Am. Jur. 2d, Carriers, § 273. Additionally, even though conditions are not on the face of the bill of lading, if the bill of lading expressly states that conditions are to be found on the reverse side thereof, as this one did, the bill of lading comes within the general rule, and the shipper is generally held to be bound by the conditions found on the reverse side. 13 Am. Jur. 2d, Carriers, § 274.

In the case before us, there is no evidence which would justify applying any rule other than the general rules set out above. Plaintiffs contend, however, that even if the tariff was admissible and even if the plaintiffs are bound by the conditions set out in the bill of lading and tariff requiring listing of "articles of extraordinary value" in order to recover for their loss, the defendant cannot rely thereon because the provisions of 49

U.S.C.A. 20 (11), commonly known as the Carmack Amendment to the Interstate Commerce Act, prohibit limitation of liability, which Amendment reads as follows:

> "Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefore, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading * * * ; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable * * * for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading."

Of course, the crucial words are " . . . receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States *to a point in an adjacent foreign country* . . . " Plaintiffs rely on the case of *Railway Express Agency, Inc. v. Hueber*, 191 S.W. 2d 710 (Tex. Civ. App. 1945), a case which is quite similar factually to the case at bar. There, one Hueber allegedly shipped some gold and silver nuggets, foreign coins and other articles of unusual value, from Los Angeles, California, to San Antonio,

Texas. They were lost, either in transit or after storage by the Express Agency. The express receipt contained a provision to the effect that the Express Company would not be liable for the loss of articles of extraordinary value unless the articles were enumerated on the receipt. The Court held, and we think properly, that the provision was an attempt to limit the liability of the carrier and, therefore, positively prohibited by the Carmack Amendment. We would agree that the provision in the bill of lading and tariff in the case now before us is a limitation and not an exclusion. Obviously, Mayflower handled the articles which were lost and was prepared to handle them. They did not exclude them from their transportation but attempted to limit their liability for loss of or damage to those articles only to situations where they were separately listed. Hueber, however, involved interstate commerce between two states and not from a state to an adjacent foreign country and more specifically not *from an adjacent foreign country to a state in the United States.* The same is true of *Missouri Pacific Railroad Company v. Elmore & Stahl,* 360 S.W. 2d 839 (Tex. Civ. App. 1962).

In *Watson v. Canadian Pac. Ry. Co.,* 237 Ill. App. 478 (1925), the shipment which was composed of cattle, originated in Canada and the ultimate destination was Chicago, Illinois. The contract of shipment provided that the shipper would not be liable for anything done or omitted to be done off the lines operated by it, and that where the destination to be reached was not on the lines operated by the defendant, it was to act only as the agent of the owner or shipper in handing over the cattle to connecting carriers. It appeared from defendant's special plea entered in the case that none of the damages occurred on defendant's lines and further that none of the services performed by defendant was in the United States, it having delivered the cattle to a connecting carrier in Canada. Plaintiff in that case contended that under the contract entered into for the transportation of the cattle, the services were to be partly performed in the United States and partly in Canada, an adjacent foreign country, and, therefore, defendant was liable under the Carmack Amendment, relying on *Galveston, H. & S. A. R. Co. v. Woodbury,* 254 U.S. 357, 41 S.Ct. 114, 65 L.Ed. 301 (1920). In *Woodbury,* Mrs. Woodbury bought a round trip ticket from a railroad company in Canada entitling her to travel over that road in Canada and connecting lines to El Paso, Texas, and return. On the return trip her trunk, which had been checked, was lost by a railroad company in Texas. The Supreme Court, in an opinion

by Mr. Justice Brandeis held that the $100 limitation in value was not applicable. In doing so, the Court passed on § 1 of the Interstate Commerce Act, not § 20 (the Carmack Amendment), and held that although § 1 of the Interstate Commerce Act contained the provision that it was to be applicable to the transportation of passengers and property *"from* any place in the United States to an adjacent foreign country", it was equally applicable to a common carrier engaged in transporting passengers and property *to* the United States *from* an adjacent foreign country. The Court said:

> "A carrier engaged in transportation by rail *to* an adjacent foreign country is, at least ordinarily, engaged in transportation also *from* that country to the United States. The test of the application of the act is not the direction of the movement, but the nature of the transportation as determined by the field of the carrier's operations. This is the construction placed upon the act by the Interstate Commerce Commission." [*Galveston v. Woodbury, supra,* 254 U.S. at 359-360.]

The Illinois Court in *Watson,* because there was no denial of and no evidence to disprove defendant's special plea that all the services rendered by defendant were rendered in Canada, affirmed the Circuit Court's dismissal of plaintiff's case. One Justice in a special concurring opinion noted that although he did not agree with all that had been said in comparing §§ 1 and 20 of the Interstate Commerce Act, he would agree that defendant would probably be liable if its *own service had extended into the United States.* A similar result was reached in *Southern Pac. R. R. Co. v. Gonzalez,* 48 Ariz. 260, 61 Pac. 2d 377 (1936). There the initial carrier was in Mexico and its services were performed wholly outside the United States.

Other courts have considered the question and with varying results under varying fact situations: *Goldberg v. Delaware, L. & W. R. Co.,* 40 N.Y. Supp. 2d 44 (Mun. Ct. of City of New York, Fourth District 1943), holding that although Congress cannot exercise extraterritorial authority over a foreign carrier, it does have jurisdiction as against a domestic carrier which unites with a railroad in Canada in the publication of a joint *through rate* from a point in Canada to a point in the United States; *Strachman v. Palmer,* 82 F. Supp. 161 (U.S. D-Ct. Mass. 1949), holding unequivocally that the Carmack Amendment by its plain, unambiguous language does not govern imports to the

United States from Canada (this case contains an excellent discussion of the history and purpose of the Act and the Newton and Cummins Amendments. See also 49 Col. Law Rev. 1009 commenting on Strachman) ; *Alwine et al v. Pennsylvania R. Co.,* 141 Pa. Super 558, 15 A. 2d 507 (1940), holding also in a well-reasoned and clearly written opinion that the Carmack Amendment insofar as it governs shipments involving adjacent foreign countries, applies only to movements *to* a foreign country, and not to movements from a foreign country; *Sklaroff et al v. Pennsylvania R. Co.,* 90 F. Supp. 961 (U.S.D.C.E.D. Pa. 1950), finding *Woodbury, supra,* inapposite and following *Alwine, supra.* In 1950, the United States Supreme Court had the question before it but since the precise question decided by the Pennsylvania Court in *Alwine, supra,* was not before it, the Court did not decide the question but said:

> "The case of *Alwine vs. Pennsylvania R. Co.* (citation omitted), much relied on by respondent and the Court of Appeals, is not in point. We need not now determine whether that case was correctly decided. For purposes of this case it is sufficient to note that there the Pennsylvania Court emphasized that the shipment came into this country on a *through* bill of lading from Canada. The contract of carriage did not terminate at the border, as in the instant case." *Reider v. Thompson,* 339 U.S. 113, 117, 70 S.Ct. 499, 94 L.Ed. 698 (1950).

[4]  We see no need to delve further into the cases and the purposes of the Amendment. In the case before the Court, the evidence supports the court's finding of fact that where the plaintiffs' property was removed from T. D'Arcy Limited in Ottawa on 13 March 1972 for the purpose of loading it onto defendant's truck for removal to Raleigh, N. C. as the property was loaded onto defendant's truck, each item was checked off the inventory and its general condition noted. It was then that defendant's driver noted that some items were damaged and some property was missing. He prepared an exception sheet. When the truck arrived in Raleigh, other items were missing. Among the additional missing items were the items now in controversy. The driver had gone through customs twice—once in Canada and once in the United States. He had stopped in Plattsburgh, N. Y., to pick up a shipment going to Goldsboro, N. C., and had gone first to Goldsboro, N. C., and unloaded that shipment before going to Raleigh to deliver the plaintiffs' property.

Leary v. Transit Company

We are without evidence as to where plaintiffs' loss occurred—whether at Canadian customs, or after the shipment arrived in the United States, still in the control of defendant. We think, under the decisions having reference to this question, this is important. While our sympathies might be with the plaintiffs, we cannot say with certainty that the loss occurred within the United States and apply the law of a decision which would result in applicability of the Carmack Amendment. Suffice it to say, we cannot, in this situation apply the Carmack Amendment prohibiting the limitations of liability attempted by defendant by its tariff and bill of lading to the fact situation before us. The contract was entered into in Canada. We know not where the loss occurred. We are of the opinion that the better reasoned opinions, the plain meaning of the words of the Cummins Amendment, an examination of the history of the Carmack, Cummins, and Newton Amendments (all generally herein referred to as the Carmack Amendment) and reference to Interstate Commerce Commission interpretation thereof [see Heated Car Service Regulations, 50 I.C.C. 620 (1918); In The Matter of Bills of Lading, 52 I.C.C. 671, 683 (1919); cf. *In re The Cummins Amendment*, 33 I.C.C. 682, 693 (1915)] indicate that Congress did not intend that the Amendment's prohibition should apply to shipments originating in an adjacent foreign country and moving into the United States and that, by agreement, such regulation of contracts entered into in Canada for goods moving into the United States was left to the Canadian Commission. Had Congress wished to amend the language it could have done so. Whether the question of avoiding the problem of legislation possibly extraterritorial in effect prevented it is the reason it has not done so is merely speculative.

Under the facts of this case, we think plaintiffs are bound by the terms of the bill of lading and the tariff.

Affirmed.

Judges HEDRICK and BALEY concur.